## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| SAFE HARBOR INTERNATIONAL LLC, individually on behalf of itself and all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | <u>**JURY TRIAL DEMANDED**</u> |
| v. | |
| BOOZ ALLEN HAMILTON, INC. | |
| Defendant. | |

Plaintiff Safe Harbor International LLC (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Booz Allen Hamilton, Inc. ("Booz Allen" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of its counsel and based upon information and belief, except as to the allegations specifically pertaining to itself, which is based on personal knowledge.

### <u>NATURE OF THE ACTION</u>

1.      This is a putative class action lawsuit brought by Plaintiff and all other similarly situated who had their confidential Internal Revenue Service ("IRS") tax return information leaked by Booz Allen. This suit arises from Booz Allen's systemic failure to safeguard its computer systems, failure to protect IRS networks and databases, and failure to monitor and restrict its personnel's data access, at the expense of the confidential tax return information of Plaintiff and the putative class members.

2.      Since at least 2008, Booz Allen has operated under one or more multimillion-dollar contracts with the Department of the Treasury or the IRS, through which Booz Allen accessed and

reviewed tax returns and return information in the course of performing IT, data processing, cybersecurity, and tax administration services for the IRS. Despite its knowledge of criminal consequences for unauthorized inspection or disclosure, and federal obligations to safeguard this data, Booz Allen chose not to protect these confidential tax returns and return information.

3.      Instead, Booz Allen willingly allowed its employees unrestricted and unmonitored access to IRS databases and systems.  This access enabled Booz Allen employees to run tailored searches to retrieve personally identifiable taxpayer data, including returns and return information, dating over a fifteen-year period.  Booz Allen enabled its employees to search IRS databases using specific keywords, as well as more generalized search parameters.  Booz Allen further permitted private downloads of the confidential information to local machines and private uploads of the taxpayer data to remote and cloud-based storage—all without sufficient tracing, monitoring, or security in place.  In effect, Booz Allen permitted its employees free rein with confidential taxpayer data, in derogation of its duty to American taxpayers, including Plaintiff and the putative class.

4.      This laxity soon delivered disastrous—but all too predictable—consequences. Beginning in 2018, Booz Allen's systemic failures converged in a massive data theft perpetrated by its employee Charles "Chaz" Littlejohn.  During his Booz Allen tenure from 2018–2021, Littlejohn used his Booz Allen credentials to search for and download the tax returns and return information of thousands of the nation's wealthiest taxpayers, including President Donald Trump, Jeff Bezos, Elon Musk, Warren Buffet, and Michael Bloomberg.  The stolen information also included the tax returns and return information of Plaintiff and the putative class.

5.      On multiple occasions, Chaz Littlejohn uploaded this stolen tax information to a private website.  He then disclosed portions of the data to ProPublica and other media outlets, including The New York Times.  ProPublica has since published nearly 50 articles using the stolen

tax data on these wealthy Americans. The articles included a high-profile piece by ProPublica in December 2021 that purportedly summarized certain tax returns of certain wealthy Americans, including President Trump, spuriously titled "These Real Estate and Oil Tycoons Avoided Paying Taxes for Years."[1]

**6.**     ProPublica later issued a follow-up story in April 2022, entitled "If You're Getting a W-2, You're a Sucker."[2]   The article used confidential tax return information to malign the nation's wealthiest people.   ProPublica has most recently used this stolen data to publish a story where it "analyzed its trove of IRS data containing information on thousands of the wealthiest Americans."[3]

7.     Booz Allen's theft and disclosure through Littlejohn was not limited to a few isolated returns.   Indeed, ProPublica claims to have received not just tax returns, but also information that is sent to the IRS about financial activities such as "income and taxes," "investments, stock trades, gambling winnings and even the results of audits."[4] In fact, even Congress confirmed there was "little doubt" that the leaked information to ProPublica—including Plaintiff's confidential tax information—"came from inside the IRS" database, and that the disclosure was "precisely what 26 U.S.C. § 6103 and related statutes were designed to prevent— the disclosure of private tax information and the political weaponization of that information."[5]

---

[1] ProPublica, *These Real Estate and Oil Tycoons Avoided Paying Taxes for Years*, PROPUBLICA, December 7, 2021, https://www.propublica.org/article/these-real-estate-and-oil-tycoons-used-paper-losses-to-avoid-paying-taxes-for-years.
[2] ProPublica, *If You're Getting a W-2, You're a Sucker*, PROPUBLICA, April 15, 2022, https://www.propublica.org/article/if-youre-getting-a-w-2-youre-a-sucker.
[3] ProPublica, *How Billionaires Have Sidestepped a Tax Aimed at the Rich*, PROPUBLICA, December 18, 2024, https://www.propublica.org/article/billionaires-net-investment-income-tax.
[4] ProPublica, *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, PROPUBLICA, June 8, 2021, https://www.propublica.org/article/the-secret-irs-files-trove-of-never-before-seen-records-reveal-how-the-wealthiest-avoid-income-tax.
[5] Letter from Congressman Kevin Brady and Senator Mike Crapo to The Honorable Janet Yellen, Secretary of the U.S. Department of Treasury (April 18, 2022), https://gop-waysandmeans.house.gov/wp-content/uploads/2022/04/4-18-2022-Brady-Crapo-to-Yellen_FINAL.pdf.

8.      Booz Allen's employee, Charles Littlejohn, ultimately pleaded guilty to a violation of 26 U.S.C. § 7213(a)(1) for unlawful disclosure of confidential tax return information.  In that plea, he admitted that, while working for Booz Allen, he had access to unmasked IRS data associated with thousands of the nation's wealthiest people, and that he exploited that access to unlawfully inspect and repeatedly disclose confidential tax return information to various media outlets.

9.      Booz Allen's willful and intentional failure to establish proper safeguards over Plaintiff's and the putative class's sensitive tax return information constitutes a violation of 26 U.S.C. §§ 6103 and 7431.

## THE PARTIES

10.     Plaintiff Safe Harbor International LLC is a Limited Liability Company organized in the state of Delaware with its principal place of business in the District of Columbia.  In April of 2024, Plaintiff received a letter from the IRS, pursuant to 26 U.S.C. § 7431(e), notifying it that Charles Littlejohn was charged in connection with unauthorized disclosure of Plaintiff's tax return or return information, in violation of 26 U.S.C. § 7431.  A true and correct copy of the letter is attached as **Exhibit 1**.



**Department of the Treasury**
**Internal Revenue Service**
Washington, DC 20224

**Date:** 04/12/2024

52986CAA
SAFE HARBOR INTERNATIONAL LLC

Dear SAFE HARBOR INTERNATIONAL LLC :

We are providing you this letter to notify you that an Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020.[1]

We have enclosed copies of Internal Revenue Code (IRC) Section 7431 and the criminal charge with this letter. IRC 7431(a) provides for civil claims for unauthorized disclosure of return information.

The Department of Justice is prosecuting this matter and has provided information about the Crime Victims' Rights Act and the status of this criminal case at **Justice.gov/criminal-vns/case/united-states-v-charles-littlejohn**. If you have any questions about your rights under the Crime Victims' Rights Act, please email the Department of Justice at **CRM-PIN.Victims@usdoj.gov**.

If you have questions about the law or any private right of action you may have, you should consult an attorney.

If you have questions for IRS about this matter, you can email us at **Notification.7431@irs.gov**, and we'll respond to you. Please do not email sensitive information (e.g., Employee Identification numbers, business addresses, bank routing and account numbers or other sensitive Business or Personally Identifiable Information).

Enclosures:
IRC Section 7431
Copy of criminal information, U.S. v. Littlejohn

---

1. See 26 USC Sec. 7431, as amended by the Taxpayer Browsing Protection Act of 1997.

Letter 6613-A (3-2024)
Catalog Number 94663T

11.     Prior to receiving the letter, Plaintiff did not know that its sensitive tax return information was disclosed.

12.     Defendant Booz Allen Hamilton, Inc. is an American government and military contractor of over 32,000 employees, purportedly specializing in intelligence.  Booz Allen is incorporated under Delaware law and headquartered in McLean, Virginia.  The company provides consulting, analysis, and engineering services to public and private-sector organizations and nonprofits, including the Department of the Treasury and Internal Revenue Service.  Defendant employed Charles Edward Littlejohn at various intervals from 2008-2021.  Defendant gave Littlejohn unfettered access to IRS systems and databases that contained confidential tax return information of thousands of American taxpayers, including Plaintiff and the putative class.  On information and belief, Littlejohn worked for Booz Allen in Lanham, Maryland at the IRS's New Carrollton Federal Building, which houses many of the IRS's information technology functions.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant.  The Court has subject matter jurisdiction because 26 U.S.C. § 7431(a) authorizes suit in a district court of the United States for the unauthorized disclosure or inspection of tax return or return information.

14.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in this State, and Plaintiff's

claims arise out of Defendant's forum-related activities.  Furthermore, a substantial portion of events giving rise to Plaintiff's claims occurred in this District.

15.     Venue is proper in this District because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND

**A.     The IRS's Shoddy Cybersecurity Infrastructure**

16.     The IRS relies heavily on IT systems and electronic data to collect, process, analyze, and maintain tax returns and return information.  But while that reliance has increased, the IRS's cybersecurity protections remain woefully inadequate.  The Treasury Inspector General for Tax Administration ("TIGTA") has repeatedly documented these system threats.

17.     For example, a 2018 TIGTA audit identified 88 separate physical security control weaknesses and over 1,700 improperly configured user accounts within the IRS.[6] TIGTA also found that the IRS's Windows Policy Checker was out of date and used three-year-old technical guidelines to conduct its analysis.[7]  As a result, TIGTA concluded "the IRS cannot ensure that sensitive taxpayer information and taxpayer dollars are preserved and protected."[8]

18.     Despite annual audits, TIGTA continued to find systemic failures by the IRS to establish appropriate administrative, technical, and physical safeguards to adequately protect against the unlawful disclosure of taxpayers' confidential tax return information.  For example, in its *Annual Assessment of the IRS's Information Technology Program for Fiscal Year 2020*, TIGTA revealed that the IRS had failed to use "encryption algorithms" in accordance with Federal

---

[6] *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, Report No. 2018-20-034, ACTIVE DIRECTORY OVERSIGHT NEEDS IMPROVEMENT AND CRIMINAL INVESTIGATION COMPUTER ROOMS LACK MINIMUM SECURITY
CONTROLS, at *Highlights* (June 27, 2018).
[7] *Id.*
[8] *Id.* At 5.

Information Processing Standards 140-2, *Security Requirements for Cryptographic Modules* for certain operating systems in order to keep confidential tax return information "unreadable for an unauthorized user."[9] Likewise, TIGTA reported that 2 out of 5 of the IRS's Cybersecurity Framework Function Areas (i.e., Identify, Protect, Detect, Respond, Recover) "were deemed as 'not effective.'"[10]

19.    TIGTA has also identified multiple security deficiencies for the IRS system that collects, converts, and stores a taxpayer's confidential tax return information into electronic records of taxpayer data.  The deficiencies included "more than 16,000 policy violations."[11]  In other instances, "the IRS inappropriately assigned business role accounts to an administrator group, resulting in those accounts [and thus inappropriate employees] having unnecessary elevated privileges."[12]  Notably, TIGTA found that the IRS "lacked management oversight to ensure that Federal and [Internal Revenue Manual] requirements are met" and, in "critical areas" housing computer rooms, "the IRS cannot control the movement of individuals and eliminate unnecessary traffic throughout this critical security area [to] reduce the opportunity for unauthorized disclosure or theft of tax information."[13]

20.    Not only did TIGTA, through its various audits, put the IRS on notice for years of the IRS's security deficiencies, but the IRS had first-hand knowledge of its vulnerabilities based on repeated data breaches.  For instance, from 2014–2015, approximately 400,000 U.S. taxpayer accounts were potentially accessed by hackers, with hundreds of thousands of additional accounts

---

[9] *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, Report No. 2021-20-001, ANNUAL ASSESSMENT OF THE INTERNAL REVENUE SERVICE'S INFORMATION TECHNOLOGY PROGRAM FOR FISCAL YEAR 2020, at 22 (Oct. 30, 2020).
[10] *See id.* at 7–9.
[11] TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, Report No. 2020-20-006, ACTIVE DIRECTORY OVERSIGHT NEEDS IMPROVEMENT, at *Highlights* (Feb. 5, 2020); *id.* at 1–2.
[12] *Id.* at *Highlights.*
[13] *Id.* at 6.

targeted.[14] Then, in 2017, IRS data from approximately 100,000 taxpayers was potentially compromised through use of a key FAFSA tool.[15] And in 2022, the IRS admitted to mistakenly publishing personal data about 120,000 individuals on its website.[16]

21.     A report from the Government Accountability Office in September 2023 also found problems with how the IRS handles taxpayer data.[17] The report found that, since 2010, 77 of the Accountability Office's recommendations for stronger safeguards had gone unheeded. The watchdog agency singled out the 14,000 IRS contractors as a potential weakness, noting that a third of the contractors had not completed a training course on protecting the records of taxpayers. "As a result, IRS contractors [were] at increased risk of being unprepared to handle taxpayer information."[18]

22.     The IRS and other related agencies were well-aware of these systemic data security failures. Indeed, the federal government previously retained multiple contractors—Booz Allen among them—to strengthen the IRS's cybersecurity protections.

**B.    Booz Allen Secures Lucrative Government Cybersecurity And IRS Contracts**

23.     In 2018, the Department of Homeland Security (DHS) issued RFPs for several multiyear contracts to protect the computer networks, electronic data, and IT systems of the IRS and other key government agencies. In February 2018, DHS awarded Booz Allen an initial six-

---

[14] Press Release, IRS Statement on "Get Transcript" (Feb. 26, 2016), https://www.irs.gov/newsroom/irs-statement-on-get-transcript.

[15] Written Testimony of Kenneth C. Corbin, Commissioner, Wage and Investment Division and Silvana Gina Garza, Chief Information Officer, Internal Revenue Service, Before the House Oversight and Government Reform Committee (May 3, 2017), https://oversight house.gov/wp-content/uploads/2017/05/Corbin-Garza-IRS-joint-Statement-FAFSA-5-3.pdf.

[16] *See* Press Release, IRS Statement on Forms 990-T (Sept. 2, 2022), https://www.irs.gov/newsroom/irs-statement-on-forms-990-t; Letter from Anna Canfield Roth, Acting Assistant Secretary for Management, U.S. Department of the Treasury, to Bennie G. Thompson, Chairman of the Committee on Homeland Security (Sept. 2, 2022), https://s.wsj net/public/resources/documents/IRSBREACH.pdf.

[17] U.S. Government Accountability Office, *Security of Taxpayer Information: IRS Needs to Address Critical Safeguard Weaknesses*, (Aug. 14, 2023), https://www.gao.gov/products/gao-23-105395.

[18] *Id.*

year, $621 million contract to further develop and implement the Department of Homeland Security's Continuous Diagnostics and Mitigation ("CDM") program, a government-wide cybersecurity effort to monitor and protect federal networks across agencies that included the IRS.

24.      In August 2018, Booz Allen secured a second, even more lucrative cybersecurity contract from the same program.  DHS, in partnership with the General Services Administration (GSA) Federal Systems Integration and Management Center (FEDSIM), selected Booz Allen as the prime contractor under the government-wide Continuous Diagnostics and Mitigation (CDM) Dynamic and Evolving Federal Enterprise Network Defense (DEFEND) Program for Group D, this time with a larger $1.03 billion task order. At the time, the contract was the largest federal task order and the second-largest cybersecurity task order in Booz Allen's history.

25.      The award required Booz Allen to enhance the cybersecurity capabilities of six federal agencies, including the General Services Administration, Department of Health and Human Services, NASA, Social Security Administration, the U.S. Postal Service, and the Department of the Treasury (including the IRS).  In securing this contract, Booz Allen claimed to design CDM solutions to help agency leaders understand their attack surface, detect evolving threats, make informed risk-based decisions, and act quickly.  Booz Allen also touted its reputation as "the leading provider of professional security services" and its commitment to "bring the best talent and most sophisticated tradecraft together to create innovative cyber solutions at an unprecedented scale."[19]

26.      Additionally, in June 2023, Booz Allen announced yet-another IRS award.  Booz Allen secured a position on the IRS Enterprise Development Operations Services (EDOS) contract,

---

[19] Press Release, *Department of Homeland Security Awards Booz Allen Hamilton $1.03B Task Order as Prime Contractor to Enhance Cybersecurity Capabilities across Six Federal Agencies* (Aug. 21, 2018), https://investors.boozallen.com/news-releases/news-release-details/department-homeland-security-awards-booz-allen-hamilton-103b.

a blanket purchase agreement that could be worth $2.6 billion over a seven-year period.  In this latest contract, Booz Allen will purportedly assist the IRS's IT teams in modernizing systems used to examine and collect taxes by improving efficiencies in tax administration, supporting the IRS's applications development portfolio, and implementing annual tax season legislative requirements.

27.    Under these three contracts, as well as several other agreements, the Department of the Treasury and/or IRS contracted with Booz Allen to perform cybersecurity, IT, and tax administration services for the IRS.  Under those contracts and agreements, the Treasury Department and the IRS permitted Booz Allen access to IRS databases, computer networks, and other systems containing the tax returns and return information of Plaintiff and other American taxpayers.  Booz Allen then provided its employees with access to the IRS's searchable tax return databases and systems, purportedly to perform their work on these government contracts.

28.    Under these three contracts alone, Booz Allen has or will receive over $4 billion in federal funds to enhance the cybersecurity of the IRS and other federal agencies.  But these taxpayer dollars cannot mitigate the data threats to the IRS.  This is because Booz Allen—the very company charged with securing IRS taxpayer data—itself has significant data vulnerabilities that preclude it from securing this sensitive information or performing tax administration services.

**C.    Booz Allen Fails To Protect Confidential Government Data**

29.    Booz Allen markets itself as a global leader in cybersecurity technology and consulting, claiming to deliver adversary insight, an innovative approach, and an understanding of advanced threats and vulnerabilities to the most sophisticated global enterprises, government agencies, and national missions.

30.    Yet Booz Allen has consistently failed to address its *own* cybersecurity vulnerabilities, and instead has repeatedly permitted its employees to access, download, and

disclose highly confidential government and company data. Those failures have been on full display over the last decade.

31.    In July 2011, for example, Booz Allen admitted that the hacking group "Anonymous" had infiltrated its company network and stolen a list of approximately 90,000 military email addresses and encrypted passwords. In that breach, Anonymous also misappropriated an assortment of data related to other companies and government networks served by Booz Allen. Anonymous further claimed to have accessed and deleted four gigabytes of the firm's source code and had reportedly discovered "maps and keys" for various government agencies and federal contractors within the Booz Allen unsecured network. Following the breach, Anonymous posted this pithy indictment of Booz Allen's security: "In [Booz Allen's] line of work you'd expect them to sail the seven proxseas [sic] with a state-of-the-art battleship, right? Well you may be as surprised as we were when we found their vessel being a puny wooden barge," explaining that the group had "infiltrated a server on [Booz Allen's] network that basically had no security measures in place."[20] Despite receiving billions in federal contracts related to federal government cybersecurity, Booz Allen's networks apparently lacked the security measures to protect it from a decentralized group of rogue hackers.

32.    Unfortunately, Booz Allen chose not to address its data security issues. Instead, it doubled down on its lax policies, repeatedly granting its employees virtually unrestricted access to both internal company servers and the external networks, systems, and databases of its government clients.

---

[20] Andy Greenberg, *Anonymous Hackers Breach Booz Allen Hamilton, Dump 90,000 Military Email Addresses*, FORBES (July 11, 2011), https://www.forbes.com/sites/andygreenberg/2011/07/11/anonymous-hackers-breach-booz-allen-hamilton-dump-90000-military-email-addresses/?sh=7984ac4e76bb.

33.    For example, in early 2013, Booz Allen assigned its employee Edward Snowden, a computer systems administrator, to work on IT systems for the National Security Agency (NSA). By May of 2013, Snowden had used his Booz Allen credentials and access to download thousands of top-secret security documents.  Snowden fled the United States and leaked the classified materials to multiple journalists, disclosing national secrets and severely compromising the NSA's anti-terror surveillance program.  Snowden ultimately fled to Russia, where Vladimir Putin granted him citizenship in 2022.

34.    Booz Allen's breaches of government systems continued unchecked.  In 2016, authorities arrested Booz Allen computer analyst Harold Martin for stealing approximately 50 terabytes of confidential data from the NSA, in a breach that authorities have called the largest theft of classified information in U.S. history.  The 50 terabytes of information from 1996 to 2016 included personal details of government employees and "Top Secret" email chains, handwritten notes describing the NSA's classified computer infrastructure, and descriptions of classified technical operations. Martin's work with Booz Allen involved highly classified projects concerning government computer systems and gave him various security clearances that routinely provided him access to top-secret information.  Among the material allegedly stolen by Martin was a top-secret document that contained "specific operational plans against a known enemy of the United States and its allies."[21]  Martin ultimately pleaded guilty to a federal charge for stealing classified information.

35.    Another significant breach occurred the very next year.  In 2017, investigators discovered that Booz Allen had left more than 60,000 confidential or sensitive files on a publicly accessible Amazon Web Services server.  Given the files' accessibility, it is highly likely that

---

[21] Government's Response to Defendant's Motion for a Detention Hearing at 4, *United States v. Martin, III*, No. 16-2254-BPG (D. Md. July 19, 2019).

malicious actors downloaded and used the publicly exposed data.  The unguarded data included passwords to sensitive government systems, credentials belonging to a senior engineer at Booz Allen, vulnerability reports on government source code, and identities of government contractors with Top Secret clearances.  The exposed files concerned the National Geospatial-Intelligence Agency (NGA), the Department of Defense agency that collects and analyzes data gathered by satellites and drones for the U.S. military and intelligence community.  The sensitive data was available for *unrestricted public download* for at least three months in 2017.

36.    In November 2022, Booz Allen admitted yet-another significant data breach.  Booz Allen's system allowed a single employee to download potentially tens of thousands of other employees' personal information from the company's internal network.  Using Booz Allen's network, the employee was able to run a report containing the personal information of "active employees as of March 29, 2021."[22]  The report contained the names, Social Security numbers, compensation, gender, race, ethnicity, date of birth, and U.S. Government security clearance eligibility and status for thousands of Booz Allen employees across the company.  Booz Allen later admitted the report containing the personal information was "improperly stored on an internal SharePoint site."[23]

## D.    Booz Allen's Unlawful Disclosure Of Plaintiff's Tax Information

37.    These pervasive data security failures and unethical practices culminated in an unprecedented taxpayer data breach by Booz Allen employee Charles "Chaz" Littlejohn.

38.    From 2008 to 2010, and then again from 2012 to 2013, Littlejohn worked for Booz Allen, principally under contracts Booz Allen had obtained for IRS work in tax administration, IT

---

[22] TechCrunch, *Booz Allen says former staffer downloaded employees' personal data*, TECHCRUNCH Nov. 18, 2022, https://techcrunch.com/2022/11/18/booz-allen-employee-data-exposed.
[23] Booz Allen, *Consumer Breach Notification* (2022), https://oag.ca.gov/system/files/BAH%20-%20Consumer%20Notification%20Template%20-%20CA.PDF.

services, or cybersecurity work.  Booz Allen again hired Littlejohn in 2017 or 2018 as an associate in its finance and economic development practice.  Littlejohn remained a Booz Allen employee through approximately 2021, working for Booz Allen on contracts it had obtained from the Department of the Treasury and/or IRS for tax administration, IT services, or cybersecurity work for the IRS.

39.     As Littlejohn's employer, Booz Allen maintained direct control over his daily schedule, instructing him on which work to perform, when to perform it, the manner of the work, and for which IRS projects.  Booz Allen maintained direct control over the details of Littlejohn's work, including his time spent analyzing IRS data for tax returns and return information, his project assignments, his performance benchmarks, and his performance reviews.

40.     Booz Allen issued Littlejohn a computer, as well as network and database credentials, for performing his IRS data projects.  Littlejohn was enrolled in the company's regular payroll.  Littlejohn's data analysis for the IRS was part of Booz Allen's regular business, for work performed under contracts with the IRS or the Department of the Treasury.

41.     On information and belief, Littlejohn took this job to advance his extreme political and ideological agenda. From prior experience on IRS contract work, Littlejohn knew he could freely access unmasked taxpayer data using his unrestricted and unmonitored access from Booz Allen.  And he aimed to use his data clearance to access and disclose tax returns and return information associated with President Trump, as well as other high-net-worth individuals. Littlejohn viewed President Trump as a dangerous threat to democracy, and he intended to obtain the President's taxpayer information from the IRS and provide it to the public.  Littlejohn also viewed the U.S. tax system as inequitable, and he believed wealthy Americans had evaded their

tax responsibilities and had received disproportionate tax advantages.  Littlejohn aimed to weaponize his access to IRS tax data to advance his radical agenda.

42.    On information and belief, Booz Allen knew of Littlejohn's extreme political views and his desire to use access to IRS data to promote those views through public disclosure of wealthy Americans' tax information.  Yet Booz Allen willingly chose not to monitor Littlejohn's activities or—even worse—knew of those activities, yet blithely ignored them.  At all times during Littlejohn's employment, Booz Allen had both the ability and duty to monitor Littlejohn's activities within the IRS database, including his searches, inspections, downloads, transfers, and disclosures of tax returns and return information.

43.    Without restriction or supervision from Booz Allen, Littlejohn began using the IRS databases and systems to extract data about President Trump and other individuals, including Plaintiff and the putative class members.  Littlejohn used the Booz Allen system and its access to the IRS systems and databases to download confidential tax returns and return information.

44.    In late 2018, Littlejohn used his Booz Allen credentials to access the tax returns and return information of President Trump and related entities and individuals.

45.    Littlejohn learned that IRS protocols could detect and prevent large downloads or uploads from IRS systems and devices.  But on or about November 30, 2018, he exploited a loophole in those controls by using his Booz Allen credentials and computer to upload the stolen tax returns and return information of President Trump and related entities and individuals to a private website that he controlled.  He then used a computer to download the data from that private website.  From the original data set stored on his personal computer, Littlejohn made copies and stored them on personal data storage devices such as his Apple iPod (which, using his specialized

technical skills, he had configured as a personal hard drive).  At all relevant times, Booz Allen allowed Littlejohn to query, inspect, extract, download, transmit, and store this data.

46.     Approximately six months later, in or about May 2019, Littlejohn contacted The New York Times to discuss providing it with tax return data on President Trump.  Between August and October 2019, Littlejohn disclosed an initial set of President Trump's tax records to The Times.  In 2020, Littlejohn stole additional tax returns and return information associated with President Trump.  In September 2020, The New York Times published the first of several articles that publicly disclosed the tax information of President Trump.

47.     But leaking President Trump's tax returns and return information did not satisfy Littlejohn's radical agenda of exposing taxpayer data and smearing wealthy Americans.

48.     Beginning in July 2020, again without any restriction or monitoring by Booz Allen, Littlejohn repeated his crimes.  He began conducting searches to pull historic tax data on the nation's wealthiest taxpayers.  Littlejohn constructed a query designed to pull data on hundreds, or even thousands, of wealthy Americans, retrieving data over a fifteen-year period.  After running the query, he stole the data set in the same manner as the President's returns, using his Booz Allen computer and credentials to upload the data from the IRS database to his personal website.

49.     On information and belief, Booz Allen had no system, supervision, or other controls in place to detect or stop this data breach.  Booz Allen did not monitor Littlejohn's activities on IRS systems or databases.

50.     In or about September 2020, Littlejohn contacted and discussed with ProPublica the possibility of disclosing the tax returns and return information of Plaintiff and thousands of other American citizens.

51.     Then, from September 2020 to November 2020, Littlejohn unlawfully disclosed Plaintiff's and thousands of others' confidential returns and return information to ProPublica using a personal storage device.  In or about November 2020, Littlejohn provided ProPublica with the password.  ProPublica then published nearly 50 articles that publicly disclosed data from the returns and return information of wealthy American taxpayers.

52.     During much of this time, and in particular between 2018 and 2021, Littlejohn was authorized by Booz Allen to access vast amounts of unmasked taxpayer data, including taxpayer returns and return information, on IRS databases. Indeed, Littlejohn's Factual Basis for Plea confirms he "was authorized, pursuant to 26 U.S.C. § 6103(n), to access vast amounts of unmasked taxpayer data, including taxpayer returns and return information, on IRS databases."[24]

53.     Booz Allen willingly allowed Littlejohn to repeatedly inspect—and repeatedly misappropriate—the confidential tax returns and return information of thousands of the nation's wealthiest taxpayers, including Plaintiff.  Booz Allen allowed Littlejohn to upload that data to a private website.  And Booz Allen allowed Littlejohn to disclose that data to ProPublica.

54.     On information and belief, Littlejohn performed these activities, including extracting and inspecting tax data for high-net-worth individuals, at least in part to benefit Booz Allen because he was requested by Booz Allen to do so, they were tasks Booz Allen expected Littlejohn to perform in the scope of his employment, and/or they reflected his ability and sophistication as an IT employee.

55.     The scope and scale of Littlejohn's unlawful disclosures appear to be unparalleled in the IRS's history. There is no precedent for a case involving the disclosure of tax return and return information associated with over a thousand individuals and entities. The human impact of

---

[24] *United States v. Charles Edward Littlejohn*, 1:23-cr-343 (D.D.C.) (ECF 9, ¶ 3).

Littlejohn's crimes and Booz Allen's misconduct is enormous.  Many victims have come forward, expressing anger and embarrassment about the exposure of their personal financial information.

56.      Worse, it appears the harm may continue indefinitely: ProPublica has continued to publish stories using the data disclosed by Littlejohn even after he entered a plea agreement.  Plaintiff and the putative class do not know the full scope of the disclosures made by Littlejohn and has been made aware only of the specific disclosures reflected in the piece-meal stories released by ProPublica.  The harm arising from Booz Allen's misconduct and its employee's crimes is extensive and ongoing.

57.      The IRS's mission, which is to "[p]rovide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all,"[25] cannot be achieved without faith that IRS contractors such as Booz Allen will safeguard citizens' private information.  Booz Allen's data breach has undermined that public trust and confidence in the IRS, an institution that is critical to the effective functioning of our government.

58.      Moreover, Booz Allen's laxity and misconduct egregiously breaches the trust placed in it by our government.  The IRS provided Booz Allen with millions in fees and access to sensitive, unmasked data associated with millions of Americans.  Instead of respecting the trust of that agency (and, by extension, hundreds of millions of individuals who shared their information with it), Booz Allen allowed its employee to exploit it for a radical political agenda.

59.      Until recently, Plaintiff and the putative class members had no idea Littlejohn had been sharing their sensitive tax data.  Plaintiff only learned of its leaked tax data through the

---

[25] IRS, *The agency, its mission and statutory authority*, https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority.

aforementioned letter from the IRS dated to April 12, 2024. *See* Exhibit 1. The DOJ and its Public Integrity Unit failed to carry out their duty to inform Plaintiff and the class of the leak.

60.     Due to Littlejohn's disclosure of Plaintiff's tax return information, Plaintiff has sustained a loss of privacy along with other harms and damages. Plaintiff brings this suit to seek redress for the unlawful misappropriation and disclosure of his confidential tax information done and allowed by Booz Allen.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

62.     Plaintiff seeks to represent a class defined as all people in the United States who had their tax return information leaked by Booz Allen through Littlejohn to the press and other unauthorized parties (the "Class"). Specifically excluded from the Class is Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

63.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class may be expanded or narrowed by amendment or amended complaint.

64.     **Numerosity.** Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, Members of the Class number in the tens of thousands. The precise number of Class Members and their identities are unknown to Plaintiff at

this time but will be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

65.    **Commonality.** Common questions of law and fact exist as to all Members of the Class and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

(a) Whether Defendant disclosed protected tax information in violation of 26 U.S.C. §§ 6103 and 7431; and

(b) Whether Plaintiff and Class Members are entitled to damages.

66.    **Typicality.** Plaintiff's claims are typical of the claims of the other Members of the Class in that, among other things, all Class Members had their sensitive tax return information disclosed by Defendant. All Class Members were comparably harmed by Defendant's wrongful conduct as set forth herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

67.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Members of the Class. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

68.    **Predominance.** Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's illegal disclosure of sensitive taxpayer return data.

69.     **Superiority.**  Class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for Class Members to obtain effective redress on an individual basis for the wrongs committed against them.  Even if Class Members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  It would also increase the delay and expense to all parties and the court system from the issues raised by this action.  The class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

70.     Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of 26 U.S.C. §§ 6103 and 7431

71.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in the preceding paragraphs of this complaint.

72.     Plaintiff Safe Harbor International LLC brings this claim individually and on behalf of the Class Members against Defendant.

73.     26 U.S.C. § 6103 provides that tax "[r]eturns and return information shall be

confidential" and applies to any "other person (or officer or employee thereof) who has or had access to returns or return information under . . . subsection (n)" *Id.* § 6103(a)(3)

74.     26 U.S.C. § 6103(n) permits the disclosure of returns and return information to any person "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration."

75.     "Return" is defined as "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed."  26 U.S.C. § 6103(b)(1).

76.     "Return information" includes "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense."  26 U.S.C. § 6103(b)(2)(A).

77.     Booz Allen is a "person . . . who has or had access to [the] returns or return information" of Plaintiff, under 26 U.S.C. § 6103(n), because the Secretary of the Treasury, pursuant to regulations prescribed by the Secretary, disclosed Plaintiff's returns and return

information to Booz Allen "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration." 26 U.S.C. § 6103(n).

78.     Under 26 U.S.C. § 6103(a), no such person who has received tax returns or return information "shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." The statute's definition of the term "officer or employee" includes a former officer or employee. *Id.*

79.     "[D]isclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

80.     26 U.S.C. § 7431 provides taxpayers a private right of action for damages against any person who is not an officer or employee of the United States for the knowing or negligent unauthorized inspection or disclosure of tax return information in violation of 26 U.S.C. § 6103.

81.     On information and belief, Booz Allen, both through its own actions and through its employee, Littlejohn, repeatedly violated 26 U.S.C. § 6103 from 2018–2021 by inspecting Plaintiff's and Class Members' confidential tax returns and return information, and then unlawfully disclosing that data to ProPublica.

82.     Booz Allen made these unlawful inspections and disclosures knowingly, or at the very least negligently or with gross negligence, including because the inspections and disclosures were made while willfully failing to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' confidential taxpayer information from the unlawful inspections and disclosures alleged herein.

83.     Booz Allen, both through its own actions and through its employee, Littlejohn, unlawfully inspected and disclosed Plaintiff's and Class Members' tax returns and return information using Booz Allen's computers and network access to IRS systems and databases. The unlawful inspections and disclosures were made within the scope of Littlejohn's employment at Booz Allen.

84.     Booz Allen, both through its own actions and through its employee, Littlejohn, caused the disclosure of the confidential return information to ProPublica and The New York Times with the intent that ProPublica and/or The New York Times would widely publish the information through their websites or through other means.

85.     Booz Allen's inspections and disclosures of Plaintiff's and Class Members' tax return information did not result from a "good faith, but erroneous interpretation of section 6103," *see* 26 U.S.C. § 7431(b)(1), but rather from knowing violations, gross negligence, and/or negligence.

86.     Booz Allen's inspections and disclosures of Plaintiff's and Class Members' tax return information were not "requested by the taxpayer," pursuant to 26 U.S.C. § 7431(b)(2).

87.     Pursuant to 26 U.S.C. § 7431(c), Plaintiff and Class Members are entitled to statutory damages in the amount of $1,000 for each act of unauthorized inspection and disclosure.

88.     Plaintiff is entitled to the costs of the action and reasonable attorney's fees pursuant to 26 U.S.C. § 7431(c)(2)-(3) if it is the prevailing party in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

(a)     Certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys

as Class Counsel to represent the Class Members;

(b)    Declaring that Defendant's conduct violates the statutes referenced herein;

(c)    Finding in favor of Plaintiff and the Class against Defendant on all counts asserted herein;

(d)    Awarding the greater of $1,000 for each unauthorized disclosure pursuant to 26 U.S.C. § 7431(c)(1)(A);

(e)    Awarding Plaintiff and Class Members their costs and expenses incurred in the action, including reasonable attorneys' fees and costs;

(f)    Ordering Defendant to pay pre-judgment interest on all amounts awarded; and

(g)    Providing such further relief as may be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: January 14, 2025        Respectfully submitted,

**MANN & RISCH LLC**

By: */s/ Nathaniel K. Risch*
      Nathaniel K. Risch

Nathaniel K. Risch (AIS: 0612130253)
101 E. Chesapeake Ave., Ste. 403
Towson, MD 21286
Tel: (410) 929-5145
E-Mail: nate@mannrisch.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*pro hac vice* forthcoming)
Israel Rosenberg (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 100019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
      irosenberg@bursor.com
*Counsel for Plaintiff and the Class*